**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                  :
SHAKEENAH INGRAM,                   :              CIVIL ACTION
                          Plaintiff,      :
                                                  :
      v.                                          :              NO. 11-6002
                                                  :
CAROLYN W. COLVIN,[1]                :
COMMISSIONER OF SOCIAL SECURITY, :
                          Defendant.      :
_____:

Henry S. Perkin, M.J.                                          February 13, 2015

**REPORT AND RECOMMENDATION**

      Plaintiff, Shakeenah Ingram ("Plaintiff"), brings this action under l2 U.S.C. §

1383 (c)(3), which incorporates 42 U.S.C. § 405(g) by reference, to review the final decision of

the Commissioner of Social Security ("Defendant"), denying her claim for supplemental security

income ("SSI") provided under Title XVI of the Social Security Act ("the Act") and disability

insurance benefits ("DIB") provided under Title II of the Act.  42 U.S.C. §§ 401-433.  Subject

matter jurisdiction is based upon section 205 (g) of the Act.  42 U.S.C. § 405(g).  Presently

before this Court is Plaintiff's Brief and Statement of Issues in Support of Request for Review,

Defendant's Response thereto and Plaintiff's Reply Brief.  For the reasons that follow, it is

recommended that the relief sought by Plaintiff should be granted in part and the case should be

remanded for further proceedings.

**I.     PROCEDURAL HISTORY.**

      Plaintiff filed applications for SSI and DIB on August 12, 2009, alleging disability

_____

    [1]    On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration and, therefore, she is automatically substituted as the Defendant in this action.  See Fed. R. Civ. P. 25(d).

beginning July 31, 2009 as a result of multiple sclerosis with myelopathy and depression.  (A.R.

180-181, 194-95, 198-99, 201-09, 230-32, 260, 264-65, 274.)  After these applications were

denied, Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at

55-64, 67-68.)  On August 4, 2010, Plaintiff, who was represented by counsel, and Sherry L.

Kristal-Turetzky, a vocational expert ("VE"), appeared and testified before ALJ Susan Flynn.

(A.R. 31-49.)  On September 9, 2010, ALJ Flynn issued an unfavorable decision, finding that

Plaintiff was able to perform light work with some restrictions and that Plaintiff had not been

disabled since July 31, 2009.  (A.R. 19-27.)  The Appeals Council subsequently denied Plaintiff's

request for review on July 20, 2011.  (A.R. 1-3, 15.)  As a result, the ALJ's decision of

September 9, 2010 became the final decision of the Agency.

On September 22, 2011, Plaintiff brought this civil action for judicial review

under 42 U.S.C. §§ 405(g) and 1383(c)(3).  Plaintiff's Brief and Statement of Issues in Support

of her Request for Review was filed on December 30, 2011, and the Defendant's Response was

filed on February 7, 2012.  Plaintiff's Reply Brief was filed on February 17, 2012, and the matter

was subsequently referred for preparation of a Report and Recommendation by the Honorable

Lawrence F. Stengel.

## II.    FACTS.

Plaintiff was twenty-three (23) years old at the time of her alleged onset of

disability, and twenty-four (24) years old at the time of the ALJ hearing, therefore she is

considered a younger individual.[2]  See 20 C.F.R. § 416.963(b)(2000).  Plaintiff graduated from

---

[2]        Because Plaintiff qualified as a "younger person" under the regulations, her age is not considered a
significant impediment to adapting to new work situations.  20 C.F.R. § 416.963(b)(2000).  The Court must
"cautiously scrutinize the employment prospects of so young an individual before placing [her] on the disability

high school and has past work experience as a cashier, customer service representative, telephone

operator and pharmacy technician.  (A.R. 36, 38, 39, 45, 133, 136-140, 147-151.)  At the ALJ

hearing, Plaintiff testified that she lives with her two children[3] and her grandmother, she has a

driver's license but stopped driving upon the onset of Multiple Sclerosis[4] in July, 2009, when she

last worked.  (Id. at 35-36.)  At the time of her onset of symptoms, Plaintiff's complaints

included migraine headaches, back spasms and weakness in her legs which caused her to not be

able to sit for long periods of time at a desk or walk long distances, and to be distracted from

concentrating on work.  Id. at 37.  She described her legs as having tingling and weakness.  Id. at

38.  She can sit for no more than one half-hour then has to stand because of back pain, she can

walk for no more than one block and can stand for twenty minutes then has to sit.  Id. at 37.  She

can lift a gallon of milk.  Id. at 39.  She has trouble staying asleep at night because of back

spasms but sleeps mostly during the day.  Id.  Heat affects her condition, and things that cause

her pain include walking long distances, climbing stairs and bending.  Id. at 40.  For treatment,

she testified that she takes Copaxone[5] to stop relapses and she gets frequent MRIs as requested

---

rolls." Lockley v. Barnhart, No. 05-5197, 2006 U.S. Dist. LEXIS 29722, at *2 n.1 (E.D. Pa. May 16, 2006)(Baylson, J.)(quoting McLamore v. Weinberger, 530 F.2d 572, 574 (4th Cir. 1976)).

[3]      Plaintiff's son was seven (7) years old at the time of the ALJ hearing, and her daughter was one (1) year old.  (A.R. 35.)

[4]      Multiple Sclerosis is defined as "a demyelinating disease marked by patches of hardened tissue in the brain or the spinal cord and associated especially with partial or complete paralysis and jerking muscle tremor." Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/multiple%20sclerosis.

[5]      Copaxone is the brand name for Glatiramer acetate, described as:

a synthetic protein that simulates myelin basic protein, a component of the myelin that insulates nerve fibers in the brain and spinal cord.  This drug seems to block myelin-damaging T-cells through a mechanism that is not completely understood.  In controlled clinical trials with relapsing-remitting MS, those taking the glatiramer acetate had a significant reduction in annual relapse rate and a reduction in new lesions as shown on magnetic resonance imaging (MRI), when compared to control subjects who were given a placebo.

by her doctor whom she sees every two to three months for monitoring.  Id.  She has no side effects from the Copaxone, but she's usually in bed a majority of the day or lying on the couch, reading and watching television.  Id.  She needs assistance taking care of her children, which her grandmother provides.  Id. at 41.  She can feed her children.  Id.  She is able to bathe herself but needs assistance with buttons.  Id.  Her hand shakes and is weak and she sometimes has trouble picking up small items and writing.  Id. at 42.  Because of her hand weakness, she is unable to lift, type, write or raise her arms over her head.  Id.  She testified that she sometimes has memory loss and as a result, her grandmother is her advocate.  Id. at 42, 43.  She has depression, mood swings, cries easily and is isolated most of the time and at the time of the ALJ hearing, she had an upcoming appointment with a psychiatrist.  Id. at 43, 44.  She testified that she gets migraines almost every day which last for about one hour which require her to lay down due to headache, sensitivity to light and loud noises.  Id. at 44.  For her migraines, she takes Tylenol which helps "a little bit."  Id.

In addition to reviewing the transcript of the ALJ hearing, this Court has independently examined the medical records and all disability reports.  We incorporate all additional, relevant facts in our discussion below.

## III.    LEGAL STANDARD.

The role of this Court on judicial review is to determine whether there is substantial evidence in the administrative record to support the Commissioner's final decision.  Any findings of fact made by the Commissioner must be accepted as conclusive, provided that

---

http://www.nationalmssociety.org/about-multiple-sclerosis/what-we-know-about-ms/treatments/medications/glatiramer-acetate/index.aspx.

they are supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence" is

deemed to be such relevant evidence as a reasonable mind might accept as adequate to support a

decision.  Richardson v. Perales, 402 U.S. 389, 407 (1971)(quoting Consol. Ed. Co. v. NLRB,

305 U.S. 197, 229 (1938).  See also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992),

cert. denied, 113 S.Ct. 1294 (1993).  The ALJ must consider all relevant evidence in the record

and provide some indication of the evidence he rejected and why he rejected it.  See Adorno v.

Shalala, 40 F.3d 43, 48 (3d Cir. 1994); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Thus,

the issue before this Court is whether the Commissioner's  final decision of "not disabled"

should be sustained as being supported by substantial evidence.  Moreover, apart from the

substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper

legal standards in evaluating a claim of disability.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

       To prove disability, a claimant must demonstrate that there is some "medically

determinable basis for an impairment that prevents [her] from engaging in any 'substantial

gainful activity' for a statutory twelve-month period."  42 U.S.C. § 423 (d) (1).  Each case is

evaluated by the Commissioner according to a five-step sequential process:

> The sequence is essentially as follows: (1) if the claimant is currently engaged in substantial gainful employment, he will be found not disabled; (2) if the claimant does not suffer from a "severe impairment," he will be found not disabled; (3) if a severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last continually for at least twelve months, then the claimant will be found disabled; (4) if the severe impairment does not meet prong (3), the Commissioner considers the claimant's residual functional capacity ("RFC") to determine whether he can perform work he has done in the past despite the severe impairment - if he can, he will be found not disabled; and (5) if the claimant cannot perform his past work, the Commissioner will consider the claimant's RFC, age, education, and past work experience to determine whether he can perform other work which exists in the national economy.  See id. § 404.1520(b)-(f).

Schaudeck v. Comm'r of Social Sec. Admin., 181 F.3d 429, 431-32 (3d Cir. 1999).  The

claimant bears the burden of proof for steps one, two, and four and the burden shifts to the

Commissioner for the fifth step - no party bears the burden for step three.  Rivera v. Comm'r of

Social Sec. Admin., 164 F. App'x 260, 262 (3d Cir. 2006).  At the fifth step, the Commissioner

has the burden of production to demonstrate the claimant is capable of performing other available

work in order to deny a claim of disability.  Fargnoli v. Massanari, 247 F.3d 34, 39 (3d Cir.

2001)(citing 20 C.F.R. § 404.1520(f)).  If at any step the Commissioner finds the claimant is

disabled or not disabled, the inquiry is at an end.  Kinney v. Comm'r of Soc. Sec. Admin., 244

F. App'x 467, 469 (3d Cir. 2007)(citing 20 C.F.R. § 404.1520(a)(4)).

## IV. ALJ DECISION AND PLAINTIFF'S REQUEST FOR REVIEW.

Plaintiff alleges disability since July 31, 2009 as a result of multiple sclerosis with

myelopathy and depression.  (A.R. 180-181, 194-95, 198-99, 201-09, 230-32, 260, 264-65, 274.)

The VE testified that Plaintiff's past work as a customer service representative was a skilled,

sedentary position, her past work as a PBX operator was a sedentary and entry-level, semi-skilled

position, her work as a pharmacy technician was light, entry-level work and her past work as a

cashier was a light and unskilled position.  (A.R. 45.)  The VE named a number of sedentary

unskilled positions a hypothetical individual with the same limitations as Plaintiff could perform,

specifically charge account clerk, call-out clerk who compiles credit information and surveillance

system monitor.  (Id. at 46-47.)  The VE further added that if the individual needs to take

unscheduled breaks of any duration and frequency in addition to the normal break of a half an

hour for lunch and two 10 or 15 minute breaks, she would not be able to sustain work due to an

6

inability to keep up with the work demands.  (Id. at 47.)  The ALJ proceeded through the sequential evaluation process and determined that Plaintiff was not disabled as a result of her MS and is unable to perform any past relevant work, but considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (A.R. 26-27.)[6]

In her Memorandum in Support of Request for Review, Plaintiff challenges the ALJ's determination that she retained the residual functional capacity ("RFC") to perform the full range of sedentary work because she alleges: (1) the ALJ's finding that she is able to understand and remember short, simple instructions and perform simple routine tasks prevents her from performing the jobs identified by the vocational expert (Pl.'s Br. at 8-14); (2) the ALJ committed a reversible error of law by failing to properly weigh the RFC assessments of Plaintiff's treating doctor and certified physician assistant (Id. at 14-19); and (3) the ALJ's finding regarding Plaintiff's RFC is not supported by substantial evidence and represents a reversible error of law.  (Id. at 19-20.)

---

[6]        The ALJ proceeded through all of the steps, finding that: (1) Plaintiff has not engaged in substantial gainful activity since July 31, 2009, her alleged onset date of disability (A.R. 21); (2) Plaintiff has the following severe impairment, multiple sclerosis (Id.); (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)(A.R. 21-22); (4) Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except lifting and/or carrying twenty pounds occasionally and ten pounds frequently, standing and/or walking four hours, sitting six hours; no climbing of ladders, ropes, or scaffolds, but occasionally climbing stairs and ramps occasionally performing other postural activities, such as balancing, kneeling, crawling and the like, and occasionally handling with the right dominant upper extremity in ta work environment where she is able to avoid concentrated exposure to extreme heat, to humidity, wetness, noise, vibration, hazards, such as moving machinery and unprotected heights, and avoid concentrated exposure to fumes, dust, odors, gases and poor ventilation.  She is able to understand and remember short, simple instructions; is able to perform simple, routing tasks, and is able to make simple decisions (A.R. 23-26); and (5) Plaintiff is unable to perform any  past relevant work but considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (A.R. 26-27.)  Thus, the ALJ found that Plaintiff had not been under a disability from July 31, 2009, her alleged date of disability, through September 9, 2010.  (A.R. 27.)

The issue before this Court is whether the Commissioner's final decision of "not disabled" should be sustained as being supported by substantial evidence. Based on an independent review of the record and for the reasons that follow, we find that the ALJ has not provided appropriate and adequate support for her decision. Accordingly, we conclude that the ALJ's decision was not supported by substantial evidence of record and therefore recommend that the case should be remanded.

## V.     DISCUSSION.

Disability is not determined merely by the presence of impairments, but rather on the functional restrictions the impairments place on an individual. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). Plaintiff must establish that her impairments result in functional limitations so severe they preclude her from engaging in any substantial gainful activity. See Dupkunis v. Celebrezze, 323 F.2d 380 (3d Cir. 1963); Gardner v. Richardson, 383 F. Supp. 1 (E.D. Pa. 1974).

To determine residual functional capacity at step five, the ALJ stated that she followed a two step process in considering Plaintiff's symptoms. First, she determined whether there was an underlying medically determinable physical or mental impairment, i.e., one that could be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's pain or other symptoms. Second, she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. This evaluation included making credibility determinations on the intensity, persistence and limiting effects of pain. The result of this analysis of Plaintiff's activities of daily living, led to the conclusion that she retained the

RFC to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight hour day, stand and walk for four hours in an eight hour day.  (A.R. 23.)  This, the ALJ found, qualified her for a range of light level work and sedentary work.  (Id. at 26.)  However, the ALJ also found nonexertional limitations that restricted the range of sedentary work: occasional postural activity such as balancing, kneeling, crawling, and occasional handling with the right dominant upper extremity in a work environment where she is able to avoid concentrated exposure to extreme heat, to humidity, wetness, noise, vibration, hazards such as moving machinery and unprotected heights and avoid concentrated exposure to fumes, dust, odors, gases and poor ventilation.  (Id. at 23-24.)  Plaintiff disputes the ALJ's conclusion that a claimant with an RFC for sedentary work limited by the nonexertional limitations the ALJ found, could perform work as a charge account clerk, call out clerk and surveillance system monitor and, accordingly, Plaintiff challenges the ALJ's conclusion at step five that she was not disabled. (A.R. 26-27.)

Plaintiff takes issue with the ALJ's RFC finding that she retained the RFC to perform the full range of sedentary work because she contends that the ALJ failed to properly evaluate the medical evidence regarding her limitations and failed to properly evaluate her subjective complaints.  Plaintiff challenges the ALJ's finding that she is able to understand and remember short simple instructions and perform simple routine tasks prevents her from performing the jobs identified by the vocational expert.  Pl.'s Br. at 8-14.  Plaintiff contends that the charge account clerk, call-out operator and surveillance system monitor positions demand greater reasoning skills than Plaintiff possesses.

A.     **Whether the ALJ's Finding That Plaintiff Is Able To Understand and Remember Short Simple Instructions and Perform Simple Routine Tasks Prevents Her From Performing The Jobs Identified By The Vocational Expert**.

The ALJ's Fifth Finding of Fact is that Plaintiff was able to understand and remember short, simple instructions, perform simple, routine tasks, and make simple decisions. (A.R. 23.)  The ALJ found that Plaintiff was capable of performing the positions of charge account clerk, call out clerk and surveillance system monitor.  (Id. at 26-27.)  Plaintiff contends that the ALJ's Finding is contradicted by the job descriptions for these positions which require Level 3 Reasoning Skills as found in the Dictionary of Occupational Titles ("DOT").  Plaintiff contends that alleged discrepancies between the DOT description of the jobs identified by the VE and the VE's testimony about those jobs requires remand to obtain a reasonable explanation for the discrepancies.  Pl.'s Br. at 12 (citing SSR 00-4p; Boone v. Barnhart, 353 F.3d 203, 209 (3d Cir. 2003); Burns v. Barnhart, 312 F.3d 113, 127-28 (3d Cir. 2003)).

Defendant responds by noting that the Plaintiff's past relevant work as a customer service representative requires a maximum reasoning level of 3, which is the same level as that required by the jobs which the VE identified.  Further, Defendant responds that Plaintiff fails to recognize that Social Security Ruling ("SSR") 00-4p, which is a policy interpretation ruling on the use of vocational expert and vocational specialist evidence and other reliable occupational information in disability decisions, explains that an ALJ may not rely on sources of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with the Commissioner's regulatory definitions.  Resp., pp. 6-7 (citing SSR 00-4p, 2000 WL 1898704 at *3 (2000)).  Defendant notes that SSR 00-4p makes clear that the

10

Commissioner's "regulatory definitions of skill levels are controlling." Id. at 7 (citing id.).

The Honorable Michael Baylson, in Simpson v. Astrue, 2011 WL 1883124 (E.D. Pa. May 17, 2011), explored the issue of alleged discrepancies between the DOT description of the jobs identified by the VE and the VE's testimony about those jobs. Judge Baylson explained that:

> Pursuant to 20 C.F.R. § 404.1566(d) and 416.966(d), the Administration may take administrative notice at step five of "reliable job information" found in the DOT. The regulations provide, as well, for the use of vocational experts and specialists to provide occupational evidence. 20 C.F.R. § 404.1566(e); 416.966(e). The Administration issued SSR 00–4p to provide guidance to resolve conflicts between these two sources of information. SSR 00–4p, at * 1. The Administration recognized that a "VE ... may be able to provide more specific information about jobs or occupations than the DOT." Id. at 3. Nonetheless, "[w]hen there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." Id. at 2. The Third Circuit has interpreted SSR 00–4p to require that the ALJ question the VE on the record about the existence of any conflict, "elicit a reasonable explanation" where such a conflict appears, and explain in the decision "how the conflict was resolved." Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir. 2002).
>
> The Third Circuit has held that a failure to follow SSR 00–4p may result in a case being remanded by the district court, Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005). However, the Third Circuit has "refused to mandate reversal where an ALJ has failed to 'discover and explain a conflict.'" Diehl v. Barnhart, 357 F. Supp.2d 804 (E.D. Pa. 2005) (finding inquiry into a possible conflict unnecessary in light of both detailed questioning of the VE by ALJ and attorney and the VE's expressed knowledge of DOT). Even recognized inconsistencies "need not be fatal if substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Rutherford, 399 F.3d at 557 (concluding that substantial evidence existed to support the ALJ's opinion, despite "minor inconsistencies" between the DOT and VE testimony, where inconsistencies did not exist as to all the jobs listed and the VE specified that the jobs named were "simply examples, rather than an exhaustive list"); see also Massachi v. Astrue, 486 F.3d 1149, 1152 n. 2 (9th Cir.2007) ("[F]ailure to make the requisite inquiry is harmless where there is no conflict or where the vocational expert's testimony provides sufficient support to justify any potential conflict."). Plaintiff bears the burden of showing that the error was harmful. Shinseki v.

11

*Sanders*, —— U.S. ——, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009).

In the DOT, SVP "levels refer to the actual skill level necessary to perform the listed job." *McHerrin v. Astrue*, No. 09–2035, 2010 WL 3516433, at *3 (E.D. Pa. Aug. 31, 2010)(Slomsky, J.)(citing SSR 00–4p). The Administration has defined "unskilled work" to correspond to an SVP of 1–2. *Id.*

DOT reasoning levels refer to informal and formal levels of education required for satisfactory job performance. *Id.* A job's reasoning level "gauges the minimal ability a worker needs to complete the job's tasks themselves." *Meissl v. Barnhart*, 403 F. Supp.2d 981, 983 (C.D. Cal. 2005). The DOT defines level–2 reasoning as the capacity to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[; d]eal with problems involving a few concrete variables in or from standardized situations." *Money v. Barnhart*, 91 Fed. App'x 210, 215 (3d Cir. 2004)(citing Appendix C: General Educational Development, U.S. Dep't of Labor, Employment & Training Admin., Dictionary of Occupational Titles, Vol. II at 1011 (4th ed.1991) (emphasis added). A reasoning level of 3 requires a person to " '[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[, and d]eal with problems involving several concrete variables in or from standardized situations.'" *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005)(quoting U.S. Dep't of Labor, Employment & Training Admin., *Dictionary of Occupational Titles*, Vol. II at 1011 (4th ed.1991)) (emphasis added).

Simpson v. Astrue, 2011 WL 1883124, *5-*6  (E.D. Pa. 2011).

Plaintiff argues that the ALJ's RFC determination was erroneous because the Dictionary of Occupational Titles describes the positions of charge account clerk and surveillance system monitor as requiring Level 3 reasoning skills, described as the ability to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "deal with problems involving several concrete variables in or from standardized situations." DOT, Appendix C.  She argues that the ALJ's finding that she can perform work as a charge account clerk or a surveillance system monitor is without substantial evidence because the ALJ also found that she is limited to work involving only simple, repetitive tasks.  Thus, she concludes, the finding that she can perform a job requiring Level 3 reasoning ability is beyond her ability.  Plaintiff points to several cases from this District in which this issue

has been addressed which support her position, including Gorden v. Astrue, Civ. A. No. 09-4542, McHerrin v. Astrue, 2010 WL 3516433 (E.D. Pa. 2010); Santore v Astrue, Civ. A. No. 09-1801 (E.D. Pa. Mar. 17, 2010), *approving report and recommendation* Feb. 25, 2010); Ellison v. Astrue, Civ. A. No. 08-2101, Colon v Astrue, Civ.A. No. 06-4971 (E.D. Pa. Nov. 14, 2007), *approving report and recommendation*, 9/28/07; Collier v. Barnhart, Civ. A. No. 04-5208 (E.D. Pa. 11/25/2005); Young v Barnhart, Civ. A. No. 05-3515(E.D. Pa. Mar. 20, 2005)(McLaughlin, J.)(limitation to simple, repetitive tasks incompatible with level 2 and 3 reasoning); Hurse v. Barnhart, Civ. A. No. 05-5483 (E.D. Pa. May 22, 2006)(Padova, J.)(approving Report and Recommendation of M.J. Hart finding limitation to simple, routine tasks precluded level 3 jobs). But see Simpson v. Astrue, Civ.A. No. 10-2874, 2011 WL 1883124, at *6-8 (E.D. Pa. May 17, 2011)(Baylson, J.)(; Salley v. Astrue, Civ.A. No. 09-4392, (E.D. Pa. Nov. 4, 2010), *approving report and recommendation*, 10/25/10 (simple instructions limitation did not prevent claimant from performing jobs requiring level 3 reasoning).

The Commissioner notes that Plaintiff performed past relevant work as a customer service representative which required a maximum reasoning level of 3, thus demonstrating that she retains the ability to perform the three jobs identified by the VE with a reasoning level of 3. Resp. at 6.  The Commissioner also asserts that the DOT lists the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.  (Resp. at 10 citing SSR 00-4p.)

Although there is some disagreement among the various courts as to whether a limitation to simple, repetitive tasks is analogous to Level 2 reasoning or is more analogous to

Level 1 reasoning,[7] the decisions have found that such a limitation is "inconsistent with the demands of level-three reasoning."  McHerrin v. Astrue, 2010 WL 3516433 (E.D. Pa. 2010)(citing Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding Level 2 reasoning to be more consistent with simple, routine work tasks)(citing Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997)(rejecting contention that claimant limited to following simple instructions could engage in full range of sedentary work, because many unskilled jobs in that category require reasoning levels of two or higher)).

Regarding the Commissioner's position, I find no support in the cases for the proposition that a job's reasoning level gauges the maximum ability a worker needs to complete the job's tasks.  The Eighth Circuit, for example, has noted that:

> The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions.  For each job described, the Dictionary of Occupational Titles specifies the type of reasoning capabilities the job requires.  2 U.S. Dep't of Labor, Dictionary of Occupational Titles, 1010-11 (4th ed. 1991).  For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions.  Id. at 1011.  Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

---

[7]     Level 2 reasoning is defined as:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

DOT, Appendix C.  Level 1 reasoning, in turn, is defined as:

> Apply commonsense understanding to carry out simple one-or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Id.

Lucy, 113 F.3d at 909.  In addition, the Tenth Circuit, in addressing two jobs with the same

reasoning level at issue here, more recently held as follows:

> The DOT states that both [jobs] require a reasoning level of three, defined as the
> ability to "[a]pply commonsense understanding to carry out instructions furnished
> in written, oral, or diagrammatic form [, and d]eal with problems involving
> several concrete variables in or from standardized situations." . . .  Plaintiff argues
> that her RFC, as found by the ALJ, is incompatible with jobs requiring a
> reasoning level of three.  The ALJ's findings with regard to Plaintiff's RFC
> include: "Mentally, [Plaintiff] retains the attention, concentration, persistence and
> pace levels required for simple and routine work tasks." . . .  This limitation seems
> inconsistent with the demands of level-three reasoning.  See Lucy v. Chater, 113
> F.3d 905, 909 (8th Cir.1997) (rejecting contention that a claimant limited to
> following only simple instructions could engage in the full range of sedentary
> work because many unskilled jobs in that category require reasoning levels of two
> or higher).  We note that level-two reasoning requires the worker to "[a]pply
> commonsense understanding to carry out detailed but uninvolved written or oral
> instructions [and d]eal with problems involving a few concrete variables in or
> from standardized situations." . . .  This level-two reasoning appears more
> consistent with Plaintiff's RFC.

Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (internal citations omitted).  Thus, it

appears that jobs requiring a reasoning level of 3 are incompatible with a limitation to simple,

routine or repetitive work.  Because the ALJ did not ask the VE whether her testimony regarding

the job of surveillance system monitor varied from the description of that job contained in the

DOT, this case must be remanded to obtain further vocational testimony.

        In making this recommendation, I am cognizant that the ALJ may rely on

vocational expert testimony that "contradicts the DOT, but only insofar as the record contains

persuasive evidence to support the deviation."  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th

Cir.1995).  The ALJ has the affirmative responsibility to ask the vocational expert about possible

conflicts between her testimony and information in the DOT.  Haddock v. Apfel, 196 F.3d 1084,

1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.[8]  Thus, before relying on evidence

obtained from a vocational expert to support a finding of not disabled, the ALJ must "elicit a

reasonable explanation for any discrepancy" with the DOT.  Haddock, 196 F.3d at 1087; SSR

00-4p, 2000 WL 189704 *1.  The ALJ also must explain how the discrepancy or conflict was

resolved.  SSR 00-4p, 2000 WL 189704 *4.  Because the ALJ did not do so here, she erred in

accepting the VE's testimony that a claimant limited to simple repetitive tasks was capable of

performing jobs that required Level 3 reasoning, and this case must be remanded for additional

vocational expert testimony and explanation in this regard..

   B.   **Whether the ALJ Failed to Properly Weigh the RFC Assessments of
        Plaintiff's Treating Doctor and Certified Physician Assistant.**

        Plaintiff next argues that the ALJ did not properly weigh the medical evidence of

record.  Pl.'s Br., pp. 14-19.  Plaintiff's medical treatment consists of seeing her doctor every two

to three months, taking Copaxone, and undergoing MRI testing.  (A.R. 40.)  Plaintiff testified

that the Copaxone helps her, and causes no side effects.  (Id.)

        On Plaintiff's initial visit at the Comprehensive MS Center at Thomas Jefferson

---

[8]      SSR 00-4p provides that

Occupational evidence provided by a VE or VS generally should be consistent with the
occupational information supplied by the DOT.  When there is an apparent unresolved conflict
between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for
the conflict before relying on the VE or VS evidence to support a determination or decision about
whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully
develop the record, the adjudicator will inquire, on the record, as to whether or not there is such
consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.  The
adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is
reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT
information.

SSR 00-4p, 2000 WL 1898704, at *2.

University on January 17, 2006, Plaintiff saw Thomas P. Leist, M.D., Director of the Center.  (Id. at 264-265.)  She reported developing double vision in late December 2005, with associated fatigue and some numbness traveling down both arms.  (Id. at 264.)  Examination of Plaintiff, including measurement of motor strength and balance, was normal.  (Id.)  Dr. Leist noted that an MRI of Plaintiff's brain taken in January 2006, for complaints of double vision in both eyes showed more than nine lesions, including a tectal lesion, lesions in the periventricular and juxtacortical locations, and a lesion in the centrum semiovale.  (Id. at 180-81, 265.)  Dr. Leist recommended that Plaintiff start a regimen of high dose interferon.  (Id.)

MRI of Plaintiff's cervical spine taken in February 2006 showed mild expansion of the cervical spinal cord, consistent with Plaintiff's history of MS; however, there was no pathological enhancement to suggest active inflammation.  (A.R. 198-99.)

Plaintiff next saw Dr. Leist and his certified physician assistant, Claire Austin, M.S., PA-C, on August 14, 2008.  (Id. at 207-209.)  Dr. Leist noted that Plaintiff stopped taking Betaseron in March 2008 due to pregnancy.  (Id. at 207.)  Plaintiff complained of dyspnea on exertion, frontal headaches, vertigo, and "rare intermittent brief sharp pain with deep inspiration."  (Id.)  Plaintiff told Dr. Leist that she had ongoing depression that was partially relieved when she stopped taking Betaseron.  (Id.)  Dr. Leist noted no weakness, insomnia, increased fatigue above baseline, or falls.  (Id.)  Physical examination was normal with regard to strength, sensation, reflexes, with nonataxic gait.  (Id. at 208.)

A followup examination on December 9, 2008 was mostly unremarkable.  (A.R. 205-206.)  Ms. Austin noted that Plaintiff was six months pregnant with her second pregnancy.  (Id. at 205.)  She further noted that Plaintiff went to the emergency room in November 2008 for

complaints of a migraine headache.  (Id.)  Plaintiff next treated with Dr. Leist on June 16, 2009.
(A.R. 203-204.)  She reported giving birth on March 9, 2009 and complained of left facial
spasms for the last four weeks (but not every day). (A.R. 203.)  Plaintiff told Dr. Leist that her
arms, legs and the right side of her back ached.  (Id.) Physical examination showed slightly
increased muscle tone in Plaintiff's lower extremities, full strength testing, slightly hyperpathic
but symmetric and 2+ deep tendon reflexes, and a wide-based "mildly slapping" station.  (Id.)
Dr. Leist's impression was MS with myelopathy and he recommended that Plaintiff restart
Betaseron.  (A.R. 204.)

　　　　　Dr. Leist saw Plaintiff one month later on July 27, 2009.  (A.R. 201-202.)
Plaintiff complained of increased fatigue, right arm weakness and lack of coordination and she
reported falling at work secondary to a right foot drop.  (A.R. 201.)  Physical examination
demonstrated mildly increased muscle tone in the right upper and lower extremities.  (Id.)  Dr.
Leist noted decreased motor strength (4- to 4 over 5) in the right deltoid, right biceps, grip,
triceps, right iliopsoas, hamstrings, quads, and dorsiflexion.  (A.R. 202.)  Dr. Leist also noted a
right drift, right upper extremity dysmetria, and right upper and lower extremity
dysdiadochokinesia.  (Id.)  Station was noted to be narrow-based, right spastic, with a right foot
drop and Dr. Leist observed that Plaintiff could tandem and toe walk but had difficulty heel
walking with right toe drop.  (Id.)  His diagnosis was again MS with myelopathy and under
"Impression and Plan," Dr. Leist prescribed Copaxone instead of Betaseron due to depressive
symptoms and recommended physical therapy for upper and lower extremity strengthening and
balance.  (Id.)  Dr. Leist wrote that Plaintiff "is unable to work at this time."  (Id.)

　　　　　A July, 2009 MRI of Plaintiff's brain showed findings consistent with progression

18

of demyelination secondary to MS.  (A.R. 194.)  Ms. Austin noted that Plaintiff lost her job

secondary to pregnancy and increased fatigue, she exhausted her Family Medical Leave Act and

sick time, and was pursuing disability benefits.  (Id. at 202.)

          Plaintiff argues that the ALJ should have accepted as controlling Dr. Leist's "To

whom it may concern" note, which he completed on Plaintiff's behalf in August 2009 stating:

> I saw [Plaintiff] in our office on July 27, 2009 and during her evaluation, it is
> clear that she is currently not able to work. [Plaintiff], like many patients with
> MS, is experiencing increased fatigue.  [Plaintiff's] strength and coordination has
> decreased while, her spasticity has increased. [Plaintiff] is
> right-handed and these symptoms especially weaken her ability to function using
> her hands.  Until further notice, [Plaintiff] should not work unless willing.

(Id. at 274.)  The ALJ observed that Dr. Leist stated that Plaintiff was unable to work due to

increased fatigue, but Plaintiff had given birth just five months earlier, had just recently restarted

MS medications, and there were no more current treatment records to show substantial decline in

her ability to function after the birth of her child.  (Id. at 25.)

          Plaintiff underwent a consultative examination by Harvey Azarva, M.D., at the

request of the state agency, on December 1, 2009.  (A.R. 230-238.)  Plaintiff related to Dr.

Azarva that her MS symptoms had become "more chronic and persistent" in recent months.

(A.R. 230.)  Plaintiff complained of weakness involving her right upper extremity and both lower

extremities, paresthesias involving her arms and legs, and intermittent urinary incontinence.  (Id.)

Plaintiff also complained of generalized weakness and chronic fatigue.  (Id.)  Plaintiff related that

she experience difficulty with manipulating buttons and zippers, handwriting for more than

several minutes, and holding eating utensils.  (Id.)  Plaintiff told Dr. Azarva that she frequently

dropped utensils, glasses, and cups. (Id.) Plaintiff reported becoming fatigued after walking more

than one block, and of falling several times.  (<u>Id.</u>)  Plaintiff also stated that she had difficulty with balancing in terms of walking on any surface that is even remotely uneven.  (<u>Id.</u>)

Dr. Azarva's physical examination of Plaintiff revealed 4/5 grip strength on the right, 5/5 on the left.  (A.R. 231.)  Dr. Azarva measured motor strength in the right foot extensors and flexors at 4/5; on the left, he noted 5/5 strength.  (<u>Id.</u>)  Plaintiff's gait was "uneven and slightly ataxic" and Dr. Azarva noted a positive Romberg sign, and borderline positive finger-to-nose test.  (<u>Id.</u>)  Deep tendon reflexes were +1/4 and symmetric in upper and lower extremities.  (<u>Id.</u>)  Dr. Azarva listed a diagnosis of MS with exacerbation in July 2009 with associated myelopathy.  (A.R. 232.)  Dr. Azarva noted evidence of impaired balance and proprioception as well as episodic urinary incontinence.  (<u>Id.</u>)  Dr. Azarva also noted decreased flexionextension and lateral flexion of the lumbar spine.  (A.R. 234.)

Theodore C. Waldron, D.O, a state agency physician, reviewed Plaintiff's claim for benefits in December 2009 and opined that Plaintiff had the physical residual functional capacity to perform light work limited to occasional postural maneuvers; occasional handling using her right extremity; and avoiding concentrated exposure to extreme heat, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards such as machinery and heights.  (A.R. 239-44.)

Michael S. Miller, M.D., a neurologist, reviewed Plaintiff's claim for benefits in January 2010, and agreed with Dr. Waldron's December 2009 findings, with the exception that the only environmental restriction would be to avoid all exposure to heat because of the risk of an exacerbation, and to avoid exposure to unprotected heights.  (A.R. 260-62.)

Ms. Austin, Dr. Leist's physician assistant, completed a MS Residual Functional

Capacity ("RFC") Questionnaire on July 27, 2010.  (A.R. 276-279.)  Ms. Austin noted the

presence of the following symptoms: fatigue; weakness; numbness, tingling or other sensory

disturbance; increased muscle tension (spasticity); sensitivity to heat; pain; difficulty

remembering; and difficulty solving problems.  (A.R. 276.)  Ms. Austin noted the presence of

significant and persistent disorganization of motor function in two extremities resulting in

sustained disturbance of gross and dexterous movement or gait and station, citing the presence of

weakness in the right upper and lower extremities, decreased coordination, left drift, and left

spasticity.  (Id.)  Ms. Austin indicated that Plaintiff has significant reproducible fatigue of motor

function with substantial muscle weakness on repetitive activity, demonstrated on physical

examination, resulting from neurological dysfunction in areas of the central nervous system

known to be pathologically involved by the MS process.  (A.R.  277.)  Ms. Austin cited in

support the presence of right hemiparesis and 4 to 4+ over 5 motor strength.  (Id.)  Ms. Austin

noted that Plaintiff suffered from MS exacerbations in July 2009 and January 2010, each of

which would prevent any work for more than a month. (Id.)

Ms. Austin stated that Plaintiff could walk one city block without rest or severe

pain, sit, stand, and walk less than two hours out of an eight hour work day, and would need to

take several unscheduled breaks to rest during a typical work day.  (A.R. 278.)  Ms. Austin noted

that Plaintiff could rarely lift and carry up to 10 pounds, and would experience significant

limitations in doing repetitive reaching, handling, or fingering.  (A.R. 278-279.)  Ms. Austin

observed that Plaintiff would likely be absent from work more than four times a month as a result

of her impairment.  (A.R. 279.) In July 2010, Ms. Austin opined that Plaintiff is completely

disabled on a Multiple Sclerosis Residual Functional Capacity Questionnaire.  (Id. at 276-79.)

Defendant argues that the ALJ was not required to accept as controlling Ms. Austin's opinion because she is a physician's assistant and a physician's assistant's opinion is not entitled to deference because it does not qualify as a "medical opinion" under the long-standing regulations.  Diaz v. Shalala, 59 F.3d 307, 312-14 (2d Cir. 1995).  The Commissioner's regulations provide that medical reports must be submitted by "acceptable medical sources," including licensed physicians and osteopaths, licensed or certified psychologists and licensed optometrists (for the limited purpose of measuring visual fields and acuity).  20 C.F.R. §§ 404.1513(a), 416.913(a).  A physician's assistant is not an "acceptable medical source" to make a diagnosis or medical assessment of a Social Security claimant's ability to work; her opinion can qualify as only "a layman's opinion."  Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991); Hartranft v. Apfel, 181 F.3d 358, 462 (3d Cir. 1999)(holding chiropractor's opinion is unacceptable medical source not entitled to controlling weight).

However, "opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances." SSR 96–2p. Social Security Ruling 06–03p clarifies how evidence from a medical source that is not an "acceptable medical source," should be evaluated by an ALJ, including opinions and other evidence from a physician assistant such as Ms. Austin.  Lehman v. Astrue,  2010 WL 2034767, at *11 (W.D. Pa.. 2010)(citing SSR 06–03p).  In evaluating this type of evidence, the ALJ should consider the following factors, to the extent each is relevant:

> • How long the source has known and how frequently the source has seen the
> individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
• Any other factors that tend to support or refute the opinion.

Id. (citing SSR 06–03p)  Although they cannot be given "controlling weight," opinions and findings of a non-acceptable medical source should be considered similarly as the opinions and findings of a treating or other physician.  Id. (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).

The ALJ rejected Ms. Austin's opinion in part because she was not an acceptable medical source, specifically stating:

> The medical source statement from Ms. Austin was carefully considered, given that she is the claimant's primary treating source for her condition.  However, as a Physician Assistant-Certified, Ms. Austin is not considered to be an acceptable medical source by the Administration (20 CFR 404.1513 and 416.913).  Furthermore, references to sensitivity to heat, pain, difficulties with memory, depression and problem-solving difficulties, and constant weakness are not well supported by the PA-C's treatment records.  Her records do not support functional decline to the extent that sitting, standing, or walking would be restricted to less than two hours, lifting restricted to rarely up to ten pounds, and no repetitive manipulation would [be] possible with the right upper limb.  Ms. Austin indicated that emotional difficulties were not noted to contribute to the severity of the claimant's symptoms.

(A.R. 25.)  Plaintiff argues that the ALJ had a duty to recontact both Dr. Leist and Ms. Austin to "clarify" the basis of their assessments.  Pl.'s Br. at 18.  Respondents correctly argue that this claim is meritless because the introductory language of 20 C.F.R. §§ 404.1512(e) and 416.912(e) states that the Agency needs to recontact a medical source for additional information if the information received "is inadequate for us to determine whether you are disabled . . ."  Because ALJ Flynn considered Dr. Leist's and Ms. Austin's opinions and weighed them against the other evidence of record and found their opinions to be, among other reasons, inconsistent because they expressed limitations beyond that supported by the evidence of record (A.R. 24-25), ALJ

Flynn was not required to recontact either source but, rather, was empowered by the regulations to discount their opinions because they were not supported by the evidence of record.  See 20 C.F.R. §§ 404.1527(c)(2), (d)(4), 416.927(c)(2), (d)(4); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) ("We are also cognizant that when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them").  The ALJ did not find these opinions unclear or ambiguous, just inconsistent and unsupported by the clinical findings and the other evidence of record.  Thus, Plaintiff's claim that the ALJ improperly evaluated the medical evidence of record must be denied.

     **C.**    **Whether the ALJ's Finding Regarding Plaintiff's RFC is Supported by Substantial Evidence.**

     Plaintiff contends that the ALJ's finding that she had the residual functional capacity to perform light work with some limitations is not supported by substantial evidence.  Given the recommendation to remand this case for further vocational expert testimony, the ALJ should also re-examine her RFC determination.

## VI.   CONCLUSION.

     Based on the record before us, the matter should be remanded so that the ALJ can reconsider her residual functional capacity determination as well as the hypothetical proposed to the VE.[9]

     Additionally, Plaintiff should be afforded a reasonable opportunity to supplement

---

[9]     The Third Circuit has consistently held that because the VE provides opinion as to the claimant's residual functional capacity, the hypotheticals posed to a VE must accurately identify "all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)(citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984) and Wallace v. Sec'y, 722 F.2d 1150, 1155 (3d Cir. 1983)(stating the expert must have evaluated claimant's particular impairments as contained in the record)).

the medical evidence to address the issues identified herein.  See Gachette v. Weinberger, 551

F.2d 39, 40-41 (3d Cir. 1977)(counsel "should be permitted to make an offer of proof regarding

what a more fully developed record might have shown"); see also Stover v. Shalala, 1995 WL

327981, *8 (E.D. Pa. May 31, 1995)(on remand, claimant was to "be given an opportunity at

th[e] rehearing to submit additional relevant evidence").  Finally, Plaintiff should remain

cognizant that the ultimate burden of proving disability rests with her.

Therefore, I make the following:

## RECOMMENDATION

AND NOW, this 13th   day of February, 2015, it is RESPECTFULLY

RECOMMENDED that the relief sought by Plaintiff should be GRANTED in part, and the

matter should be REMANDED to the Commissioner in accordance with the fourth sentence of

42 U.S.C. § 405(g).


BY THE COURT:


/s/ Henry S. Perkin
HENRY S. PERKIN,
United States Magistrate Judge

25